# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 22-10710

MICHAEL CLOUD,

*Plaintiff-Appellee,*

v.

THE BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, DALLAS IN CASE NO. 3:20-CV-1277
HONORABLE KAREN GREN SCHOLER, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFF-APPELLEE

MATTHEW NIS LEERBERG
FOX ROTHSCHILD LLP
434 Fayetteville Street, Suite 2800
Raleigh, North Carolina 27601
(919) 755-8700

CHRISTIAN S. DENNIE
FOX ROTHSCHILD LLP
2501 North Harwood Street, Suite 1800
Dallas, Texas 75201
(972) 991-0889

KIP D. NELSON
FOX ROTHSCHILD LLP
230 North Elm Street, Suite 1200
Greensboro, North Carolina 27401
(336) 378-5200

*Attorneys for Plaintiff-Appellee*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

**No. 22-10710 –**    Michael Cloud v. The Bert Bell/Pete Rozelle NFL Player Retirement Plan

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this appeal.  These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal.

**Defendant-Appellant**
The Bert Bell/Pete Rozelle NFL Player Retirement Plan

**Counsel for Defendant-Appellant**
Michael L. Junk
Edward J. Meehan
GROOM LAW GROUP, CHARTERED

Dill Mitchell McFarland
Nolan C. Knight
Toni L. Anderson
MUNSCH HARDT KOPF & HARR, P.C.

Pratik A. Shah
James E. Tysse
Michael Weisbuch
AKIN GUMP STRAUSS HAUER & FELD LLP

**Plaintiff-Appellee**
Michael Cloud

**Counsel for Plaintiff-Appellee**
Christian S. Dennie
Matthew Nis Leerberg
Kip D. Nelson
FOX ROTHSCHILD LLP

/s/ Christian S. Dennie
Christian S. Dennie
*Counsel for Plaintiff-Appellee*

i

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Given the deferential standard of review that applies in this case and the district court's extensive findings of fact, this Court can affirm on the briefs alone. Nevertheless, because of the importance of the issues involved, Plaintiff-Appellee Michael Cloud does not oppose Defendant-Appellant's request for oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ...........................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES ...........................................................v

STATEMENT OF THE CASE...........................................................1

    A.    Cloud's NFL career and injuries ..........................................1

    B.    The NFL Benefits Plan.....................................................3

    C.    Cloud's multiple attempts to obtain benefits .............................7

        1.    The 2009 initial application for line-of-duty benefits................7

        2.    The 2014 application.................................................8

        3.    The 2016 application for reclassification............................9

    D.    Procedural History.......................................................15

STANDARD OF REVIEW .............................................................16

SUMMARY OF THE ARGUMENT .......................................................18

ARGUMENT .......................................................................19

    A.    Statutory Background......................................................19

    B.    The District Court Correctly Held That the Plan Denied Full and Fair Review of Cloud's Application for Reclassification of Benefits ........................................................................22

        1.    The Board did not consider all information...........................23

        2.    The Board improperly deferred to others .............................25

        3.    The Board failed to consult with a health care professional .........................................................27

        4.    The Board knew that it wasn't doing its job..........................28

5.      The district court's finding that the Board did not conduct a full and fair review is fully supported by the record and in line with decisions by courts across the country ................................................................................30

C.     The District Court Correctly Rejected the Plan's Timeliness Argument.............................................................................................33

D.     The Plan Cannot Raise Any Other New Arguments on Appeal................................................................................................36

E.     The District Court Did Not Abuse Its Discretion by Allowing Limited Discovery.................................................................................37

F.     The District Court Did Not Err in Entering Judgment in Favor of Cloud..................................................................................................41

1.      Cloud should have been reclassified under the Plan language.............................................................................................41

2.      Remand to the Plan Would Have Been Unnecessary and Futile................................................................................................45

G.     The District Court Did Not Abuse Its Discretion in Awarding Attorney Fees ........................................................................................47

CONCLUSION ........................................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Advoc. Health Care Network v. Stapleton*,
  581 U.S. 468 (2017)..................................................................19

*Aetna Health Inc. v. Davila*,
  542 U.S. 200 (2004)............................................................ 20, 21

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985)..................................................................17

*Anderson v. Cytec Indus., Inc.*,
  619 F.3d 505 (5th Cir. 2010) ...................................................39

*Armstrong v. Bert Bell NFL Player Ret. Plan*,
  646 F. Supp. 1094 (D. Colo. 1986) ..........................................33

*Ashmore v. NFL Player Disability & Neurocognitive Benefits Plan*,
  No. 16-81710-CIV-MARRA, 2018 WL 3424453
  (S.D. Fla. June 15, 2018) .........................................................46

*Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  694 F.3d 557 (5th Cir. 2012) .............................................. 17, 31

*Barhan v. Ry-Ron Inc.*,
  121 F.3d 198 (5th Cir. 1997) ....................................................38

*Black & Decker Disability Plan v. Nord*,
  538 U.S. 822 (2003)..................................................................19

*Brumm v. Bert Bell NFL Ret. Plan*,
  995 F.2d 1433 (8th Cir. 1993) ............................................ 29, 32

*Bunner v. Dearborn Nat'l Life Ins. Co.*,
  37 F.4th 267 (5th Cir. 2022) ............................................... 16, 17

*Bussian v. RJR Nabisco Inc.*,
  223 F.3d 286 (5th Cir. 2000) ....................................................20

*Caldwell v. Life Ins. Co. of N. Am.*,
  287 F.3d 1276 (10th Cir. 2002) ................................................45

*Carter v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   No. CV-11-BE-3821-KOB, 2012 WL 6043050
   (N.D. Ala. Dec. 3, 2012) ................................................................32

*Cedyco Corp. v. Petroquest Energy, LLC*,
   497 F.3d 485 (5th Cir. 2007) .......................................................44

*Chevron USA, Inc. v. Aker Mar. Inc.*,
   689 F.3d 497 (5th Cir. 2012) .......................................................36

*Clean Air Council v. U.S. Steel Corp.*,
   4 F.4th 204 (3d Cir. 2021) ...........................................................44

*Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., LLC*,
   878 F.3d 478 (5th Cir. 2017) .......................................................16

*Crosby v. La. Health Serv. & Indem. Co.*,
   647 F.3d 158 (5th Cir. 2011) .......................................................39

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) .................................................................40

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   487 F. Supp. 3d 807 (N.D. Cal. 2020) ........................................29

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   855 F. App'x 332 (9th Cir. 2021) ........................................ 31, 46

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   No. 19-CV-05360-JSC, 2022 WL 1786576 (N.D. Cal. June 1, 2022) .........29

*Donachie v. Liberty Life Assurance Co. of Bos.*,
   745 F.3d 41 (2d Cir. 2014) ...........................................................22

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982) .........................................................20

*Gagliano v. Reliance Standard Life Ins. Co.*,
   547 F.3d 230 (4th Cir. 2008) .......................................................38

*George v. Reliance Standard Life Ins. Co.*,
   776 F.3d 349 (5th Cir. 2015) .................................... 17, 18, 37, 46

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   925 F. Supp. 2d 700 (D. Md. 2012) ...............................................3

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
No. ELH-12-634, 2013 WL 6909200 (D. Md. Dec. 31, 2013) ....................32

*Hackett v. Xerox Corp. Long-Term Disability Income Plan*,
315 F.3d 771 (7th Cir. 2003) ...........................................................30

*Hamsher v. N. Cypress Med. Ctr. Operating Co.*,
620 F. App'x 236 (5th Cir. 2015).....................................................45

*Hardt v. Reliance Standard Life Ins. Co.*,
560 U.S. 242 (2010).......................................................................47

*In re Marshall*,
261 F. App'x 522 (4th Cir. 2008)....................................................32

*Intel Corp. Inv. Poly Comm. v. Sulyma*,
140 S. Ct. 768 (2020).....................................................................35

*Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
209 F. App'x 305 (4th Cir. 2006).....................................................32

*Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
493 F. Supp. 3d 1147 (M.D. Fla. 2020) .........................................32

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)...................................................................30

*Lafleur v. La. Health Serv. & Indem. Co.*,
563 F.3d 148 (5th Cir. 2009) ..................................... 21, 30, 37, 46

*LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*,
703 F.3d 835 (5th Cir. 2013) ..........................................................47

*Madden v. ITT Long Term Disability Plan for Salaried Emps.*,
914 F.2d 1279 (9th Cir. 1990) ........................................................25

*Manuel v. Turner Indus. Grp., L.L.C.*,
905 F.3d 859 (5th Cir. 2018) ..........................................................39

*Mello v. Sara Lee Corp.*,
431 F.3d 440 (5th Cir. 2005) ..........................................................18

*Metro. Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008)................................................................ 20, 21

*Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*,
832 F. App'x 586 (11th Cir. 2020) .......................................... 30, 31

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982).......................................................................17

*Miletello v. RMR Mech., Inc.*,
    921 F.3d 493 (5th Cir. 2019) .....................................................19

*Moller v. El Campo Aluminum Co.*,
    97 F.3d 85 (5th Cir. 1996) .........................................................26

*Moore v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
    282 F. App'x 599 (9th Cir. 2008).............................................32

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*,
    898 F.3d 461 (5th Cir. 2018) .....................................................38

*Newsom v. Reliance Standard Life Ins. Co.*,
    26 F.4th 329 (5th Cir. 2022) ........................................... 16-17, 46

*Reich v. Lancaster*,
    55 F.3d 1034 (5th Cir. 1995) ................................................ 21, 31

*Rivera v. Kirby Offshore Marine, LLC*,
    983 F.3d 811 (5th Cir. 2020) .....................................................17

*Robinson v. Comm'r*,
    69 F.2d 972 (5th Cir. 1934) .......................................................22

*Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*,
    986 F.2d 580 (1st Cir. 1993).......................................................25

*Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*,
    704 F.3d 362 (5th Cir. 2013) ................................................ 36, 37

*Salomaa v. Honda Long Term Disability Plan*,
    642 F.3d 666 (9th Cir. 2011) ................................................ 27, 37

*Salovaara v. Eckert*,
    222 F.3d 19 (2d Cir. 2000) ........................................................22

*Schadler v. Anthem Life Ins. Co.*,
    147 F.3d 388 (5th Cir. 1998) ................................................ 22, 27

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
    860 F.3d 259 (4th Cir. 2017) .....................................................32

*Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
    No. WDQ-09-2612, 2012 WL 2374661 (D. Md. June 19, 2012) ..... 32-33, 46

*United States v. Stalnaker*,
    571 F.3d 428 (5th Cir. 2009) ....................................................38

*White v. Life Ins. Co. of N. Am.*,
    892 F.3d 762 (5th Cir. 2018) ....................................................21

*Wildbur v. ARCO Chem. Co.*,
    974 F.2d 631 (5th Cir. 1992) ............................................... 40, 42

*Willett v. Blue Cross & Blue Shield*,
    953 F.2d 1335 (11th Cir. 1992) ................................................26

**Statutes & Other Authorities:**

29 U.S.C. § 502(a)(1)(B) .............................................................21

29 U.S.C. § 1104(a)(1)(A) ...........................................................20

29 U.S.C. § 1104(a)(1)(B) ...........................................................20

29 U.S.C. § 1105(c)(1) ................................................................25

29 U.S.C. § 1132(a)(1)(B) ...........................................................39

29 U.S.C. § 1132(a)(3) ................................................................21

29 U.S.C. § 1133(1) ...................................................................36

29 U.S.C. § 1133(2) ...................................................................20

29 C.F.R. § 2509.75-8 ................................................................26

29 C.F.R. § 2520.104(b)-1(b)(1) ...................................................36

29 C.F.R. § 2560.503-1 ...............................................................21

29 C.F.R. § 2560.503-1(g) ...........................................................27

29 C.F.R. § 2560.503-1(g)(1) .......................................................36

29 C.F.R. § 2560.503-1(h)(2)(iv) .............................................. 23, 24

29 C.F.R. § 2560.503-1(h)(3) .......................................................15

29 C.F.R. § 2560.503-1(h)(3)(ii) ...................................................23

29 C.F.R. § 2560.503-1(h)(3)(iii) ............................................. 23, 28

29 C.F.R. § 2560.503-1(h)(4) .......................................................23

29 C.F.R. § 2560.503-1(i)(3)(ii) ..............................................................14

29 C.F.R. § 2560.503-1(m)(5) ................................................................36

Elverine F. Jenkins, *Only the Headstrong Survive:  The Tragic Course of
   Head Injury Claims Under the Bert Bell/Pete Rozelle NFL Player
   Retirement Plan*, 63 Syracuse L. Rev. 327 (2013) .......................................33

Federal Rule of Civil Procedure 26 ......................................................39

The Employee Retirement Income Security Act of 1974 (commonly known as "ERISA") was enacted to protect those who participate in employee benefit plans. The district court below understood that employee benefit plans are to be administered in the best interests of the participants—here, retired football players. Plaintiff-Appellee Michael Cloud, a former NFL player who suffered significant injuries during his football career, sought total and permanent disability benefits under an employee benefit plan. ERISA obligated the plan to conduct a full and fair review of Cloud's claim. But as the record confirms, the plan's review was neither full nor fair. The district court correctly recognized that Cloud's "claim for disability benefits was wrongfully and arbitrarily denied in a process that lacked the procedural safeguards both promised by the benefits plan and required by law." ROA.12549. With countless district court findings of fact left unchallenged—and unchallengeable—on appeal, the judgment should be affirmed.

## STATEMENT OF THE CASE

### A. Cloud's NFL career and injuries

Cloud attended Boston College on a full scholarship, graduating with a degree in socioeconomics. ROA.12282. After an All-American football career there, he was drafted in the 1999 NFL draft and ultimately played for three teams over a seven-year career. ROA.12282. Cloud helped the New England Patriots win Super Bowl XXXVIII and led the team in rushing touchdowns in 2003. ROA.12282.

1

During Cloud's football career, he sustained at least seven major concussions and an estimated twenty "dings"—a euphemism for other concussions. ROA.15967-15968, 15989-15990, 15998-15999, 16162-16164. Most significantly, Cloud suffered a crippling helmet-to-helmet concussion during an NFL game on October 31, 2004.[1] ROA.12476, 12553-12554, 13627, 13653. A physician specially trained in the effects of concussions stated that "significant physical and cognitive problems occurred immediately after this collision and Mr. Cloud experienced confusion, disorientation and dizziness as a result of the impact." ROA.14350. Following the collision, Cloud also started experiencing headaches and vertigo. ROA.14454, 16331.

Cloud tried to continue his football career through the 2005 NFL season, but he had difficulties recalling plays and was "removed" from games. ROA.14454, 15225, 15884-15885, 16204. Making matters worse, he sustained another concussion on November 7, 2005 in another NFL game and "continued to have subconcussive blows until he finished playing in the NFL." ROA.20211-20212, 20384.

---

[1] The NFL's concussion protocol was not in place in 2004. ROA.15719. Cloud, like many of his contemporaries, returned to practice and competition only 48 hours after sustaining a major concussion and without any medical studies or imaging to determine the effects of the injury. ROA.12477, 20194, 20197.

Following his NFL career, Cloud attempted to obtain other employment. ROA.16144, 16169-16172. He tried to be a personal trainer, a state trooper, and a sportscaster, but he experienced extensive difficulties related to his orthopedic and neurological injuries and was unable to work. ROA.16144, 16169-16174, 16330-16331. By the end of the 2005 NFL season, Cloud's injuries had rendered him totally and permanently disabled. ROA.16212, 19855-19856.

## B. The NFL Benefits Plan

The NFL established the Bert Bell/Pete Rozelle NFL Player Retirement Plan to provide, among other things, disability benefits to football players like Cloud. The Plan "is an employee pension benefit plan" governed by ERISA. *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 702-03 (D. Md. 2012). It was established pursuant to collective bargaining agreements between the NFL Players Association and the NFL Management Council. *Id.* at 703.

However, the Plan has not been administered as intended. By the Plan's own admission, the language of the governing documents is confusing. ROA.13065. The documents have been principally drafted, interpreted, and applied by one entity: the Groom Law Group, the Plan's longtime legal counsel. ROA.5643, 5762, 5992.

The Plan documents differentiate between players disabled in the "line of duty," yielding some benefits, and those "totally and permanently" disabled, which triggers greater benefits. ROA.14606-14608. Line-of-duty benefits are given to

players who can still work despite suffering substantial impairments arising out of football activities. On the other hand, a player is totally and permanently disabled if he has a permanent condition that prevents him from engaging in any occupation or employment. ROA.198, 14607, 11975. A player who has been determined by the Social Security Administration to be eligible for disability benefits is presumptively deemed to be totally and permanently disabled under the Plan. ROA.198, 11975, 14671-14673.

For a player who is totally and permanently disabled, the Plan further distinguishes "active" from "inactive" classifications. A player qualifies for "Active Football" benefits "if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled 'shortly after' the disability(ies) first arises." A condition is conclusively deemed to occur "shortly after" an injury if it arises within six months after the disability first arises, and can be deemed to occur "shortly after" if it arises within 12 months after the disability first arises. ROA.200, 11977. Alternatively, a player can receive "Active Football" benefits "if the requirements for a total and permanent disability are otherwise met" and the player has a psychological/psychiatric disorder that "is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions)." ROA.201. By contrast, the category of "inactive" benefits

4

"does not require that the disability arise out of League football activities."
ROA.11976.   The difference between active and inactive disability benefits
payments amounts to approximately $130,000 per year.  ROA.11980-11981.

When a player seeks benefits under the Plan, the application is first reviewed
by the Disability Initial Claims Committee.  ROA.219.  The Committee is supposed
to consider all information in the administrative record and notify the player if
additional information is required.  ROA.228-229.  If the Committee denies benefits,
it is required to provide notice to the player that explains the specific reason for the
decision and any internal rule or guideline relied on.  ROA.228-232.

If the player is dissatisfied with the Committee's determination, he can seek
review from the Retirement Board.  The Board is the final adjudicator of all claims
under the Plan and, as such, is a fiduciary under ERISA.  ROA.220, 11979, 13177-
13179, 15548, 15189.  Like the Committee, the Board is supposed to take "all
available information" into account.  ROA.229.  The Board is obligated to afford
"no deference" to the Committee's determination and is instead supposed to review
the application *de novo*.  ROA.229, 15885.

The Board makes decisions at quarterly meetings and decides all cases before
it in a single day.  As one Board member explained, "the cases are read and voted
on *en masse*," not "one by one."   ROA.15531, 15738.  Another Board member
confirmed that applications are denied "as a slate" of "50, 60 cases" without any

5

discussion or analysis by the Board. ROA.15857-15858, 15887-15888; *see also* ROA.13835 (explaining that the Board approves or denies disability applications in "large blocks").

Like the Committee, the Board is supposed to notify the player of an adverse determination within five days and provide both the specific reasons for the adverse determination and the specific Plan provisions on which the determination is based. ROA.230.

The members of the Committee and the members of the Board, as fiduciaries, are supposed to act "solely and exclusively" in the best interest of the players. ROA.220, 11979, 15548, 15189.

Even when some benefits are awarded, an initial determination under the Plan is not set for all time. Instead, the Plan allows for reclassification based on "changed circumstances." ROA.205, 11978. This provision is important, since "[c]onditions do change." ROA.15394. However, the term "changed circumstances" is not defined in the Plan, and the Plan's interpretation has "evolved over time." ROA.15881; *see also* ROA.656, 687.

6

### C. Cloud's multiple attempts to obtain benefits

#### *1. The 2009 initial application for line-of-duty benefits*

At the direction of the Plan administrators, Cloud initially applied for line-of-duty benefits under the Plan in June 2009. ROA.17161-17167. In that application, he listed his conditions as including vertigo, headaches, memory loss, and concussions. ROA.17161-17165. The Committee delayed a decision so a neurological evaluation could occur, ROA.17154, but that evaluation never happened. No psychological evaluation was performed, either. ROA.16116. Rather, in one sentence, the Committee denied Cloud's application for line-of-duty benefits. ROA.17131. The Committee concluded that Cloud was not impaired enough. ROA.1731-1736.

Cloud then sought further review by the Board, as the Plan allowed. ROA.18258. This time, Cloud was evaluated by a Plan neurologist, who noted "several concussions" and "signs and symptoms" resulting from "traumatic brain injuries." ROA.15252, 14242-14244, 17084. The Plan neurologist recommended "an MRI of the brain with gradient echo imaging" to better evaluate the "traumatic brain injury" sustained by Cloud while playing in the NFL, but, again, no neurological or neuropsychological testing was performed. ROA.16475. Nevertheless, the Board eventually determined that Cloud qualified for line-of-duty disability benefits. ROA.17053.

### *2. The 2014 application*

Meanwhile, Cloud also sought social security benefits. In 2014, the Social Security Administration deemed Cloud disabled in a "fully favorable decision." ROA.14161, 14163. The administrative law judge determined that Cloud was unable to work due to traumatic brain injuries sustained while playing in the NFL. ROA.14163.

Since such a finding by the Social Security Administration is conclusive evidence of total and permanent disability under the Plan, ROA.198, 11975, 14671-14673, Cloud then filed an application for such Plan benefits, ROA.14158-14159. The application complied with the Plan's requirements. ROA.15235. The 2014 application listed symptoms including irritability and cognitive injuries. ROA.15252. These symptoms were corroborated by others, including medical professionals and Cloud's ex-wife. ROA.16333.

Although the Committee ultimately agreed that Cloud was totally and permanently disabled, it only awarded "inactive" (rather than "active") benefits under the Plan. ROA.20632, 15253, 15390, 15411. In rejecting the claim for "active" benefits, the Committee stated, without analysis, that Cloud was not disabled "shortly after" his injury. ROA.14344-14347.

Committee members confirmed that they did not read all of Cloud's medical documentation, apparently and mistakenly believing there was no need to do so since

Cloud had already been awarded benefits by the Social Security Administration. ROA.15235, 15390-15391. The Committee did not evaluate or take into account Cloud's orthopedic injuries or neurological impairments. ROA.15411. Thus, the decision to award only inactive benefits was not based on underlying symptoms. ROA.13191-13192. Committee members could not explain what analysis, if any, underpinned their decision—nor did they request any additional medical documentation, schedule an MRI or EEG, or refer Cloud to a neutral physician. ROA.14438, 15213, 15223, 15413, 15261, 15262-15263, 19869.

### 3. *The 2016 application for reclassification*

Unfortunately, between 2014 and 2016, Cloud's condition continued to deteriorate, and he experienced new concussion symptoms and medical conditions. Cloud's ex-wife testified that in this timeframe, Cloud "flipped the switch" and became a different person. ROA.16351. A psychologist also concluded that Cloud possessed all five symptoms of neurocognitive disorder. ROA.16415.

Accordingly, in 2016, Cloud submitted another application under the Plan and sought reclassification to Active Football benefits based on changed circumstances. ROA.14352-14354. Cloud identified new conditions (such as "affective disorder") and explained that the application was based on "cumulative mental disorders." ROA.15255, 15886. As with the previous application, the 2016 application complied with the Plan's requirements. ROA.15235.

9

In reviewing the 2016 application for reclassification, Committee members could not recall reading the entire file. ROA.13335, 13473, 13839. Instead, in the words of one member, "anything could have happened." ROA.15263. A few days after the application was submitted, Cloud's request was denied by the Committee for "No Changed Circumstances." ROA.14537, 18849. In its decision letter, the Committee wrote that "changed circumstances" means "a change in a Player's condition (i.e., a new or different impairment)." ROA.15540-14544. The letter was written by the Groom Law Group, not the Committee members. ROA.15254. The Committee members didn't even bother to read the letter before it went out. ROA.15222, 15257.

Cloud sought further review by the Board. ROA.15131-15134. Cloud noted that he was seeking "'Active Football' benefits," that he satisfied "all of the criteria for an award of Active Football benefits," that he was "suffering from neurological impairments" and "cumulative mental disorders," and that he was "at a distinct disadvantage when it comes to applying for benefits under the NFL Player Retirement Plan." ROA.14552-14555. Cloud also requested active benefits on the alternative ground that he fit within one of the Plan's exceptions in which changed circumstances are not required. ROA.14554. Cloud offered to submit for medical examination (although no such examination occurred) and provided additional documentation. ROA.17198, 20652.

Review of the application was once again delegated to the Groom Law Group. ROA.15696, 20649. In fact, according to documentation uncovered below, Cloud's appeal was denied days *before* it was supposed to be considered by the Board at its November 16, 2016 meeting. ROA.20071, 20074, 20686. For example, on November 10, a list showed dispositive comments on Cloud's application, including an "x" in the denial column and the statement "[n]o changed circumstances." ROA.19901, 20069, 20071, 20074. Then, the day *before* the Board meeting, an unknown advisor of the Board placed an "x" in the "DENY" column for Cloud and indicated "No clear and convincing evidence of changed circumstances." ROA.20686.

Cloud's application to the Board formally came on for decision along with 113 other cases on November 16, 2016. ROA.19901-19904. All 114 cases were addressed in an approximately ten-minute meeting—"shorter than normal"— amounting to just over five seconds per case. ROA.20711.

Board members had no knowledge of Cloud's appeal prior to the meeting and did not review documents about his appeal. ROA.15878. Indeed, Board members are not made aware of disability benefits cases at all until they report for the Board meeting. ROA.13845. Afterwards, Board members could not remember anything about Cloud's application. ROA.15177, 15363, 15713, 15842. The Board did not

ask Cloud any questions, request any additional documents, or send Cloud for medical evaluation.

Instead, the Board relied on the Committee's decision and used "advisors" that were part of the Committee. ROA.15879-15880. Without discussion, the Board formally denied Cloud's application as a part of the "slate" with the other 113 cases. According to an email from a Plan office employee to a paralegal at the Groom Law Group, the reason for denial was that there was no "clear and convincing evidence" of changed circumstances. ROA.20707-20708.

The paralegal then drafted a denial letter. ROA.20720-20723. Board members did not provide any input for the letter; the paralegal used a "template" commonly used in all decisions. ROA.15696. The Board did not review the letter before it was sent to Cloud, and Board members assumed that a lawyer had drafted the letter. ROA.15696. The letter sent to Cloud contained several mistakes, including a citation to a non-existent section of the Plan. ROA.15164, 15744, 15891. Further, the letter erroneously indicated Cloud was not totally and permanently disabled and falsely stated that a psychologist's report had been included with the 2014 application. ROA.14580-14585. The letter also stated that "changed circumstances" means "a new or different impairment from the one that originally qualified" that "arose while you were an Active Player," even though the term "changed circumstances" is defined nowhere in the Plan. ROA.14581. Board

members had no communications with the paralegal about Cloud's case or any rationale for the decision.  ROA.13241-13242, 13486, 13849-13850.

Months later, the Groom Law Group paralegal drafted minutes from the November meeting of the Board.  ROA.20733.  The minutes were not finalized until the end of February 2017.  ROA.20759-20760.  The minutes stated that Cloud's application for reclassification had been denied "for failure to meet the requirements of Plan section 5.7(b)."  ROA.19125-19126.  Again, the paralegal drafted the minutes without any communication, direction, or oversight from the Board. Further, the "finalized meeting minutes" made no reference to Cloud's impairments, the definition of "changed circumstances," the meaning of "shortly after" under Section 5.3(e) of the Plan, Section 5.4(b)'s special rules for psychological disorders, or a side-by-side comparison of Cloud's 2014 application and 2016 application for reclassification.  ROA.19125-19126, 13263-13264.  The Plan never did introduce any evidence showing how the paralegal came up with the denial letter or minutes in the first place.

There were other procedural irregularities and missteps along the way.  For example, the Plan has control of the medical records associated with players' applications, but players are entitled to review those records.  ROA.15198, 15564, 16087.  Both ERISA as well as Department of Labor regulations require the Plan to produce medical records and records associated with disability benefits applications

when requested.  ROA.15573, 15575.  Yet, when Cloud sought his records, ROA.16639-16641, 17522-17524, the Plan did not provide them, ROA.16346. There was no reason not to provide the records when requested.  ROA.15228, 15745-15746.  Instead, according to a Board member, the only way to learn what really happened is to bring a lawsuit: "they would know if they—if they sued us.  So, if someone went to court, they would find out, as you have done, . . . what's in the board decision and what's in the letter."  ROA.15727.

Next, the denial letter was not timely sent.  Although a player is supposed to be notified within five days of the Board's determination, the Board's letter was not sent until seven days after the meeting.  ROA.14124, 20730; *see also* 29 C.F.R. § 2560.503-1(i)(3)(ii).

Worse, the Board failed to conduct an appropriate review of the application. Cloud had presented affective disorder (and other medical conditions) as a basis for seeking reclassification.  ROA.15760, 19850.  Yet, in denying the application Board members did not know what affective disorder was and did not do any research to find out.  ROA.15417,15760-15761.  Despite a new medical condition being listed in Cloud's documentation, the Board made no effort to evaluate affective disorder or any other cognitive or psychological condition presented by Cloud in his application for reclassification.  ROA.15761.

14

Finally, Board members recognized that they did not have the training to analyze cognitive impairments, neurological impairments, or psychological or psychiatric impairments, and any such analysis would need to be performed by a health care professional with sufficient training. ROA.13457-13458, 13825, 13834. Yet, the Board did not have Cloud evaluated by a neutral physician, despite Cloud's agreement to be so evaluated. ROA.13463, 13467, 13471. Throughout the purported review of Cloud's application, the Board took no steps to evaluate the changes in his impairments. ROA.13463, 13467 13471, 13832-13834, 13837.

## D. Procedural History

Following the Board's denial of reclassification, Cloud filed a complaint in federal district court asserting two claims for relief under ERISA. ROA.32-46.

Although the entire claims file was much larger, the Plan filed only 529 pages as the "administrative record." ROA.162, 15746; *see also* 29 C.F.R. § 2560.503-1(h)(3) (obligating plans to make available "all documents, records, and other information relevant to the claimant's claim for benefits"). The district court then ordered the Plan to produce additional documents and allowed Cloud to obtain limited discovery.

The matter came before the district court in May 2022. During that trial, Board members admitted to several ERISA violations, admitted that they did not review the entire file when considering Cloud's application, and admitted that they

improperly gave deference to the Committee's determination. *See, e.g.*, ROA.13175-13176, 13194.  As the district court noted in its opinion, the Board is committed to denying benefits.  ROA.13815-16, 13980

By memorandum opinion and order dated June 21, 2022, the district court ruled that Cloud's "claim for disability benefits was wrongfully and arbitrarily denied in a process that lacked the procedural safeguards both promised by the benefits plan and required by law."  ROA.12549.  The court made 212 findings of fact and then applied those facts to the law to hold that the Plan had failed to provide Cloud a full and fair review and wrongfully denied reclassification.  ROA.12633-12679.  The court ordered the Plan to provide Cloud with Active Football benefits, calculated back benefits, and awarded attorney fees and costs.  ROA.12712-12716.

The Plan then appealed.  ROA.12778.

## STANDARD OF REVIEW

The Plan's recitation of the standard of review is incorrect.

After a bench trial on an ERISA claim, this Court reviews the district court's findings of fact for clear error. *Bunner v. Dearborn Nat'l Life Ins. Co.*, 37 F.4th 267, 274 (5th Cir. 2022); *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., LLC*, 878 F.3d 478, 483 (5th Cir. 2017).  Indeed, this Court recently reiterated that even in the ERISA context it "will not set aside the district court's factual findings unless they are clearly erroneous." *Newsom v. Reliance Standard Life Ins. Co.*, 26 F.4th 329,

334 (5th Cir. 2022). "This is a high standard," such that the district court's findings will not be set aside even if this Court "would have weighed the evidence differently and made a different finding." *Id.* at 335. Reversal is only appropriate "if a review of all the evidence leaves us with the definite and firm conviction that a mistake has been committed." *Id.* "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

The Plan has not even argued—much less shown—that any of the district court's 212 factual findings are clearly erroneous. Accordingly, those factual findings are binding and should not be disturbed. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 437 (1982); *Rivera v. Kirby Offshore Marine, LLC*, 983 F.3d 811, 816 (5th Cir. 2020). Any case-management decisions made by the district court will not be disturbed either, absent an abuse of discretion. *Bunner*, 37 F.4th at 277.

Ordinarily, district courts and appellate courts alike afford deference to discretionary decisions made by ERISA plan administrators. *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 352 (5th Cir. 2015); *but see Atkins*, 694 F.3d at 567 (explaining that the abuse-of-discretion standard does not apply when the

record evidences "utter disregard of the underlying purpose of the plan"). Nevertheless, legal theories are always reviewed *de novo*. *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444 (5th Cir. 2005).

The Plan's explanation of the standard of review sidesteps all of this, failing to mention the standard of review for district court findings of fact *at all*. (*See, e.g.*, Appellant's Br. at 27 (including a misleading partial quote from *George*, 776 F.3d at 352)).

## SUMMARY OF THE ARGUMENT

ERISA was enacted to protect those who participate in employee benefit plans. Employers are not required to provide benefit plans, but if they *do* then they must comply with the statute and follow their own rules. One such requirement is for the plan administrator—acting as a fiduciary—to provide a full and fair review of a participant's claim for benefits.

Here, the Board administering the NFL's ERISA plan rubber-stamped the denial of Cloud's application for benefits. The Plan had an opportunity to explain itself in a bench trial below, but ended up admitting the hollowness of its review process. The district court made careful findings of fact based on the Plan's own evidence, which remain unchallenged on appeal. Those findings confirm that the Plan denied Cloud full and fair review of his claim. The Plan failed to take into account all information submitted by Cloud, gave improper deference to the

decisions of others, and erroneously refused to consult with an appropriate health care professional. The district court correctly determined that these procedural missteps deprived Cloud of his rights under ERISA.

Against that devastating record, the Plan's appeal leads off with an entirely different issue—one that it stipulated away before the district court. Other than that, the Plan's argument on appeal amounts to a plea for deference. But deference only attaches to fiduciaries who actually did their job. If the Board had bothered to look at the evidence before it, it would have seen that Cloud should have been awarded Active Football benefits. The district court recognized as much. Because remand for additional proceedings would have been futile, the district court's judgment should be affirmed.

## ARGUMENT

### A. Statutory Background.

ERISA "is a comprehensive federal statute that regulates employee benefit plans." *Miletello v. RMR Mech., Inc.*, 921 F.3d 493, 495 (5th Cir. 2019). "[It] was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003). The statute "furthers these aims in part by regulating the manner in which plans process benefits claims." *Id.*; *see also Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 472 (2017) (explaining

that ERISA "obligates private employers offering pension plans to adhere to an array of rules" that are designed to "protect plan participants"). "ERISA imposes higher-than-marketplace quality standards on insurers" and "sets forth a special standard of care upon a plan administrator," which is to process claims "solely in the interests of the participants and beneficiaries" of the plan. *Glenn*, 554 U.S. at 115.

Thus, ERISA imposes on fiduciaries of employee benefit plans certain responsibilities, including a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A); *see also Bussian v. RJR Nabisco Inc.*, 223 F.3d 286, 294 (5th Cir. 2000) ("ERISA's duty of loyalty is 'the highest known to the law.'"); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (explaining that fiduciary "decisions must be made with an eye single to the interests of the participants and beneficiaries"). In carrying out their duties (*i.e.*, reviewing a claim for benefits and following a plan's procedures), fiduciaries must act prudently. 29 U.S.C. § 1104(a)(1)(B); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 219 (2004) (explaining that "a benefit determination is part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan").

Among other things, ERISA dictates that every employee benefit plan must afford a participant a "full and fair review" of the denial of benefits. 29 U.S.C. § 1133(2). A "full and fair" process for a plan participant includes "knowing what evidence the decision-maker relied upon, having an opportunity to address the

accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009). There must be a "meaningful dialogue" between the participant and the plan. *Id.* The requirement for full and fair review "underscores the particular importance of accurate claims processing." *Glenn*, 554 U.S. at 115. "The relevant regulations also establish extensive requirements to ensure full and fair review of benefit denials." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004); *see* 29 C.F.R. § 2560.503-1 (laying out requirements for a procedure to constitute full and fair review). A violation of the "full and fair review" requirement provides "an independent basis to overturn a plan administrator's denial of benefits." *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 770 n.2 (5th Cir. 2018).

Moreover, ERISA serves a remedial purpose. *Reich*, 55 F.3d at 1046. Thus, a plan participant is expressly permitted to sue to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 502(a)(1)(B). In other words, ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); *see also* 29 U.S.C. § 1132(a)(3). The purpose of such suit is to allow a participant "to recover benefits due to him under the terms of his plan."

*Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998).  In furtherance of the statute's remedial purpose, Congress created fee provisions to encourage participants to enforce their rights. *Donachie v. Liberty Life Assurance Co. of Bos.*, 745 F.3d 41, 45-46 (2d Cir. 2014) ("It is well-established that Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights." (internal quotation omitted)); *Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir. 2000) (explaining that a "favorable slant toward ERISA plaintiffs is necessary to prevent the chilling of suits brought in good faith—the purpose of ERISA being to promote the interests of plan beneficiaries and allow them to enforce their statutory rights").

## B. The District Court Correctly Held That the Plan Denied Full and Fair Review of Cloud's Application for Reclassification of Benefits.

The Plan maintains that the Board "followed all applicable ERISA procedures."  (Appellant's Br. at 24).  However, saying something "does not make it so."  *Robinson v. Comm'r*, 69 F.2d 972, 973 (5th Cir. 1934).  After a full bench trial, in which the Plan was permitted to introduce any evidence or testimony in its favor, the district court determined that the Plan failed to provide full and fair review of Cloud's application for reclassification.[2]

---

[2] It is unclear whether the Plan is disputing that a bench trial was appropriate in this matter.  Although any such argument has been waived due to inadequate briefing, Cloud notes that only the Plan called live witnesses at trial.

That decision was correct.  To constitute "full and fair" review of an adverse determination, a benefits plan's claims procedure must (among other requirements) 1) take into account all information submitted by the participant, 2) not afford deference to the initial adverse benefit determination, and 3) include consultation with an appropriate health care professional when the determination is based in whole or in part on a medical judgment.  29 C.F.R. § 2560.503-1(h)(2)(iv), h(3)(ii), h(3)(iii), h(4). Like any other benefits plan, the Plan here was required to comply with these regulations.  Yet, the Plan violated each of those requirements—three independent bases to affirm the district court's judgment.

**1.  The Board did not consider all information.**

Contrary to what the Plan now states, the district court did not determine that the Plan failed to consider Cloud's *claim*.  (*See* Appellant's Br. at 40-41).  Instead, the district court determined that the Board failed to abide by ERISA's instruction to "take into account all information" submitted by Cloud.  ROA.12536-12537. Indeed, as the district court explained, there was no way Board members could have possibly taken into account all the information—they didn't even review the record. Board members admitted as much.  ROA.13481, 13479.  At trial, Board members confirmed that they exercised no oversight of their purported "advisors," did not know who conducted any purported review, and did not know what the purported

23

"advisors" reviewed to deny Cloud's claim days *before* the Board meeting. ROA.20071, 20074, 20686.

On appeal, the Plan admits that Board members "must 'take into account' all records." (Appellant's Br. at 42 (quoting 29 C.F.R. 2560.503-1(h)(2)(iv))). Yet, in this case Board members conducted no actual review of Cloud's request for reclassification. In violation of the Plan, the Board did not: 1) request additional documentation from Cloud (Sect. 5.2(d)), ROA.14093, 2) obtain and inspect records from Cloud's NFL employers (Sect. 8.2(l)), ROA.14106, 3) consider all information in Cloud's file (Sect. 8.9), ROA.14114, 4) take into account all available information (Sect. 12.6(a)), ROA.14123, 5) notify Cloud that additional information was required (Sect. 12.6(a)), ROA.14123; or 6) seek to obtain a medical review (Sect. 5.2(c), 12.6(a)), ROA.14122. On appeal, the Plan maintains that someone may have reviewed "the *material* records." (Appellant's Br. at 42). However, the Plan does not even identify what those "material" records are.

Further, the Plan expressly incorporates ERISA's fiduciary obligations, including that the Board and the Committee are to discharge their duties "solely and exclusively in the interest of the Players and their beneficiaries" (*i.e.*, Cloud and his two sons) with "care, skill, prudence, and diligence." ROA.11979, 13827, 14114, 13450. Board members knew as much. ROA.13173, 13175, 13446-13447, 13449,

13451.  Yet, the Board (and the Committee) failed to fulfill those responsibilities here.  ROA.15547-15548.

**2.  The Board improperly deferred to others.**

For review of an adverse decision to be "full and fair," it cannot be based on blind deference to the decisions of others—by the initial reviewing committee, an outside paralegal, or otherwise.   True, a plan may "expressly provide for *procedures . . .* for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities . . . under the plan."  29 U.S.C. § 1105(c)(1) (emphasis added).  But such delegation is only proper when procedures are in place and "a named fiduciary properly designates another fiduciary." *Madden v. ITT Long Term Disability Plan for Salaried Emps.*, 914 F.2d 1279, 1283-84 (9th Cir. 1990).  "To be an effective delegation of discretionary authority so that the deferential standard of review will apply, . . . the fiduciary must properly designate a delegate for the fiduciary's discretionary authority."  *Rodriguez–Abreu v. Chase Manhattan Bank, N.A*., 986 F.2d 580, 584 (1st Cir. 1993) (noting the absence of "plan provisions which provide express procedures for the delegation").

Here, the Plan has no express or written delegation procedures.  ROA.13501, 13863-13864.  So, *any* delegation was unlawful.  Yet, the Board's delegation here reached so far that unknown advisors decided Cloud's claim *before* the Board members knew anything about it.  ROA.13845.  As a result, the "Board" simply

25

deferred to the Committee's initial adverse benefit determination—precisely the passivity barred by the regulations.  ROA.13501, 13861-62, 13931.

Besides, even an authorized delegation does not relieve an administrator of its duties.  The Board still needs to monitor its delegees "in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards." 29 C.F.R. § 2509.75-8 at FR-17; *see also Willett v. Blue Cross & Blue Shield*, 953 F.2d 1335, 1341 (11th Cir. 1992) ("[D]elegation of a fiduciary duty does not end forever the delegating fiduciary's responsibility for ensuring that the duty is discharged . . . .  [Such] fiduciary must always be prepared to reassume a delegated fiduciary duty when it becomes apparent to the fiduciary that the party responsible for performing the duty has breached its obligation . . . .  [A] fiduciary who becomes aware that a co-fiduciary has breached a fiduciary duty to plan beneficiaries may not escape liability by simply casting a blind eye toward the breach.").

Had the Board made its own decision, it would have had to issue a denial letter explaining its reasons.  Again, though, the Plan's boilerplate denial letter was written by a paralegal without any input from the Board.  ROA.19125-19126, 13263-13264.  That is insufficient.  "[I]n order to provide legally sufficient notice under ERISA, denial letters must state specifically the evidence upon which the denial is based." *Moller v. El Campo Aluminum Co.*, 97 F.3d 85, 88 (5th Cir. 1996).  The "specific

reasons" are important, 29 C.F.R. § 2560.503-1(g); "[b]aldfaced conclusions" do not suffice, *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998), nor may a plan concoct new reasons after the fact, *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) (concluding "[t]he plan's reasons for denial were shifting and inconsistent as well as illogical . . . . Failing to pay out money owed based on a false statement of reasons for denying is cheating, every bit as much as making a false claim.").

The district court correctly determined that the Board had shown improper deference to the decisions of others.

### 3.  The Board failed to consult with a health care professional.

The Plan asserts that no consultation with a health care professional was required because the decision "was based on a straightforward comparison of the conditions listed in [Cloud's] request for reclassification and those supporting his prior benefits award." (Appellant's Br. at 45-46).  That is incorrect.

Cloud's application for reclassification was based on the fact that he had "flipped the switch" and become a different person.  ROA.16351.  Leading up to the application, a psychologist determined that Cloud exhibited all five symptoms of neurocognitive disorder.  ROA.16415.  The application listed new conditions (such as affective disorder) and was based on "cumulative" injury.  ROA.15255, 15886.

Yet, the Board purportedly denied reclassification by asserting that Cloud had not demonstrated changed circumstances. The changed circumstances asserted by Cloud directly related to his cognitive impairments and psychological condition. Thus, the Groom Law Group paralegal's denial was necessarily "based in whole or in part on a medical judgment"—which required consultation with an appropriate health care professional. *See* 29 C.F.R. § 2560.503-1(h)(3)(iii).

The Plan cannot escape the district court's determination by recasting the decision as one that "involved no medical judgment." (*See* Appellant's Br. at 47). It plainly did involve medical judgment—or should have.

### 4. The Board knew that it wasn't doing its job.

Board members knew that these procedural irregularities, and others, violated the Plan. For example, the testimony offered by the Plan confirmed that: 1) the Board's failure to review all of Cloud's file was a violation of the terms of the Plan, ROA.14114, 14123, 13178, 13194, 2) the Board's reliance on the decision of the Committee was a violation of the terms of the Plan, ROA.14123, 15880; and 3) the failure to send the decision letter to Cloud within five days of the Board meeting was a violation of the terms of the Plan, ROA.14124, 13255.

These missteps were all the more remarkable given the fact that courts have repeatedly noted the Plan's failures in this regard. For example, the Eight Circuit explained:

> [T]he Board's construction of the benefits scheme seems
> inconsistent with Plan goals to the extent that we assume the Plan
> sought to meet the reasonable expectations of Plan participants
> familiar with the type and prevalence of cumulative injuries
> incurred by those in their profession, as well as the reasonable
> expectations of those reading a plan whose benefits scheme
> appears simply to differentiate between football and non-football
> disability.

*Brumm v. Bert Bell NFL Ret. Plan*, 995 F.2d 1433, 1438, 1440 (8th Cir. 1993).

Similarly, the Northern District of California recently explained:

> On review, the Retirement Board *doubled down* and generically
> concluded that the SSA's grant of benefits did not alter its
> independent conclusion that the evidence surrounding [Mr.
> Dimry's] December 2014 application did not show that [he] was
> totally and permanently disabled under the terms of the Plan. In
> so doing, the Retirement Board made up its own *implausible
> reasons* for disregarding the SSA's decision that *were not the
> result of a principled reasoning process.*
>
> In light of this course of conduct, little deference is owed to the
> Retirement Board's decision.

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 19-CV-05360-JSC, 2022

WL 1786576, at *4 (N.D. Cal. June 1, 2022) (internal citations and quotations

omitted) (emphasis added); *see also Dimry v. Bert Bell/Pete Rozelle NFL Player Ret.

Plan*, 487 F. Supp. 3d 807, 818 (N.D. Cal. 2020) (chiding the Plan for acting as an

"adversary, not a fiduciary"). So too here. The district court correctly concluded

that the Plan "doubled down" with "implausible reasons" to deny Cloud's

application without a full and fair review. *See* ROA.12533.

29

**5. The district court's finding that the Board did not conduct a full and fair review is fully supported by the record and in line with decisions by courts across the country.**

All in all, the district court correctly determined that these missteps (among others) constituted more than "technical noncompliance"; they evidenced a plan procedure that violated ERISA. *See Lafleur*, 563 F.3d at 157; *see also Robinson*, 443 F.3d at 394 (rejecting the plan's argument because the two procedural errors shown by the participant "taken together, amount to more than mere technical noncompliance or a *de minimus* violation").

The Plan is aghast that a district court would question its judgment and require the Board to comply with the Plan provisions and ERISA. But whatever discretion a plan has, a federal court's review of a plan's decision "is not a rubber stamp and deference need not be abject." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003); *see also Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 594 (11th Cir. 2020) (explaining that even when a district court reviews the Plan's determination under a deferential standard, "the standard does not render us a mere stamp of approval"). *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019) (agencies must first exercise "fair and considered judgment" in order to trigger *Auer* deference).

Based on the evidence before it, the district court made extensive findings and correctly held that the Plan had violated ERISA by depriving Cloud of full and fair

review of his application for reclassification.   This determination is a clear

distinction from the cases principally cited by the Plan, which were summary

judgment decisions (reviewed *de novo*).   For example, the Plan heavily relies on a

case that affirmed summary judgment following an arbitration and was based on

"mixed medical opinions and a standard that requires us to uphold a plan's benefits

determination absent an abuse of discretion."   *Atkins v. Bert Bell/Pete Rozelle NFL*

*Player Ret. Plan*, 694 F.3d 557, 570 (5th Cir. 2012).   In previous summary judgment

decisions, the Court "had no occasion" "to determine how we should review trial

court findings regarding *disputed* facts."   *See Reich v. Lancaster*, 55 F.3d 1034, 1044

(5th Cir. 1995).   Here, the district court held a bench trial and made (unchallenged)

findings of fact.   This is simply not a summary judgment case.

Nor is the district court's decision an outlier, as the Plan suggests.   (*See*

Appellant's Br. at 27 (calling the decision here "unprecedented")).   Court after court

has "pulled back the curtain" to reveal decision-making by the Plan that bears little

resemblance to that envisioned by ERISA or becoming of a fiduciary.   *Dimry v. Bert*

*Bell/Pete Rozelle NFL Player Ret. Plan*, 855 F. App'x 332, 333 (9th Cir. 2021)

(affirming that "the Plan committed procedural error in evaluating Dimry's claim

under ERISA"); *Mickell*, 832 F. App'x at 593, 594 (holding that the Plan abused its

discretion when "it failed to review relevant medical evidence that supported Mr.

Mickell's claim" and failed "to consider the combined effects of all of his

31

impairments"); *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 261 (4th Cir. 2017) ("Because the Board failed to follow a reasoned process or explain the basis of its determination . . . we are compelled to affirm."); *Moore v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 282 F. App'x 599, 601 (9th Cir. 2008) (holding that the Plan's decision to terminate benefits was not "based upon a reasonable interpretation of the Plan's terms"); *In re Marshall*, 261 F. App'x 522, 526 (4th Cir. 2008) (per curiam) (holding that the Plan's decision was not "the result of a deliberate, principled reasoning process"); *Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 209 F. App'x 305, 305 (4th Cir. 2006) (holding that the Plan "lacked substantial evidence to justify its denial" of benefits); *Brumm*, 995 F.2d 1433 (holding that the Plan's construction was unreasonable and it acted arbitrarily and capriciously in denying benefits); *Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 493 F. Supp. 3d 1147, 1170 (M.D. Fla. 2020) ("The Court finds that the Board did not reasonably decide the cause of Keys' total and permanent disability."); *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. ELH-12-634, 2013 WL 6909200 (D. Md. Dec. 31, 2013) (holding that the Plan "abused its discretion in denying Football Degenerative benefits"); *Carter v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. CV-11-BE-3821-KOB, 2012 WL 6043050 (N.D. Ala. Dec. 3, 2012) (holding that the Plan "did not review all available pertinent information"); *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. WDQ-09-2612, 2012 WL

2374661 (D. Md. June 19, 2012) (holding that the Plan abused its discretion under ERISA).

Indeed, courts and commentators have been decrying the Plan's actions for decades. *See, e.g.*, *Armstrong v. Bert Bell NFL Player Ret. Plan*, 646 F. Supp. 1094, 1095 (D. Colo. 1986) ("Since his injury on the gridiron, Armstrong has met his most implacable foe on the field of intractability against a home team, the National Football League's retirement plan. Each time he nears the goal line and is about to obtain the disability benefits which the plan promises to injured players, the yard markers are changed and the clock is stopped."); Elverine F. Jenkins, *Only the Headstrong Survive: The Tragic Course of Head Injury Claims Under the Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 63 Syracuse L. Rev. 327, 352 (2013) ("Under the current NFL Retirement Plan, it seems that players making legitimate claims for benefits will most likely be denied benefits or in the alternative receive the lowest amount of benefits provided under the Plan despite overwhelming evidence that the player deserves, and is in dire need of the disability benefits.").

## C. The District Court Correctly Rejected the Plan's Timeliness Argument.

Before this Court, the Plan's lead argument is that Cloud's claim for review should have been dismissed from the start because his administrative appeal from the Committee to the Board was untimely. This argument is based on the premise that Cloud "received (via FedEx) the decision letter on March 4, 2016," and his

33

appeal "was not filed until September 2, 2016—*182 days* after receipt." (Appellant's Br. at 29). Since the Plan obligates a participant to file an appeal within 180 days of receipt of the decision letter, ROA.229, Cloud's application was two days late, the Plan now argues.[3]

The main problem with this argument is that the Plan already expressly stipulated to a *different* date of receipt that renders the application timely:

> MR. MEEHAN: [I]f it's all right, I would actually invite Mr. Dennie to state, on the record, the stipulation we've been working out so that I can be sure it's in words that the plaintiff is comfortable with.
>
> THE COURT: Okay. Thank you.
>
> MR. DENNIE: Your Honor, we've discussed a stipulation as to the FedEx document. It's plaintiff's position that a FedEx was picked up, or received, by Mr. Cloud on the doorstep on March 6th, 2016, which was a Sunday. There's no position taken on when that was dropped off.
>
> THE COURT: Is that the stipulation?
>
> MR. MEEHAN: Yes, Your Honor, that is. And if I could – yeah, that's the stipulation. *We agreed on that.*

ROA.13751 (emphasis added).

The date of receipt is all that matters, as the parties agreed below, ROA.15603-15604, 15891, and as the Plan acknowledges on appeal, (Appellant's Br. at 29). That

---

[3] This argument based on a purported two-day deficiency is ironic given the Plan's repeated arguments that it *substantially complied* with Plan requirements. (Appellant's Br. at 8, 28-29).

is the only sensible result, since a player can only *know* the date he received the decision, not the date it was sent or might have been left on a doorstep. *See Intel Corp. Inv. Poly Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (construing a different ERISA timing provision as requiring actual notice, not constructive notice, since ERISA is designed to "ensure that the individual participant knows exactly where he stands with respect to the plan").

Even if the Plan had *not* entered into a dispositive stipulation, the Plan's timeliness argument would still fail. All the Plan has to go on is the statement in the denial letter drafted by the Groom Law Group paralegal that Cloud's appeal was "untimely" based on the Plan's records. ROA.15890. But the Plan never identified what records those were. ROA.15890. Instead, the Plan admitted it merely made an "assumption" about when Cloud received notice. ROA.13088.

After all, how could the Plan know when a person actually received a package, without a signed receipt of some kind? The Plan introduced no evidence proving that Cloud received the letter on any date other than March 6, 2016. ROA.15732, 15763, 15891. The Plan did not try to obtain a signed receipt. ROA.13154, 13203-13204. Indeed, the Plan has no evidence of Cloud's signature for the letter at all. ROA.15604.

Nor does FedEx have records to the contrary. The tracking number proffered by the Plan was "nonexistent" and "invalid." ROA.1622. And in any event, delivery

by FedEx is improper under ERISA regulations.  29 C.F.R. §§ 2560.503-1(g)(1),
2560.503-1(m)(5), 2520.104(b)-1(b)(1).  So, technically, the Committee's decision
was never properly sent or received by Cloud *at all*, to this day.

Unsurprisingly, then, *the Board* never decided that Cloud's application was
late.  To the extent they made a decision at all, it was on the basis of "No Changed
Circumstances."  ROA.14537, 18849.  Timeliness was not mentioned in the minutes
of the Board meeting, nor was it one of the reasons given to the Groom Law Group
paralegal to deny reclassification.  Timeliness was yet another argument exclusively
concocted by the paralegal without review by the Board.  ROA.13088.

**D.  The Plan Cannot Raise Any Other New Arguments on Appeal.**

On appeal, the Plan attempts to interject a *new* timeliness argument never
raised in the district court below.  (*See* Appellant's Br. at 17 n.3, 68).  That's not
allowed.  *See Chevron USA, Inc. v. Aker Mar. Inc.*, 689 F.3d 497, 503 (5th Cir.
2012).

Nor would it matter if the Plan *had* raised this argument in the district court,
because even then it was too late.  No such assertion appears in the paralegal's denial
letter.  Therefore, it could not have been raised below anyway.

ERISA requires that a plan provide "the specific grounds for its benefit claim
denial."  *Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*, 704
F.3d 362, 366 (5th Cir. 2013); *see also* 29 U.S.C. § 1133(1).  It is "those 'specific

reasons,'" rather than the decision on benefits generally, "that must be reviewed." *Robinson*, 443 F.3d at 393. "Allowing plan administrators to offer new justifications for a denial after the claims process has ended would undermine the claims system that Congress envisioned when it drafted ERISA's administrative review provisions." *George*, 776 F.3d at 353. The administrative process is not a "trial run" that allows a plan to offer a "post hoc rationale" after it loses in court. *Id.*; *see also Salomaa v. Honda Long Term Dis. Plan*, 642 F.3d 666, 678 (9th Cir. 2011) (concluding that a plan's "reasons for denial were shifting and inconsistent as well as illogical" and that "[f]ailing to pay out money owed based on a false statement of reasons for denying is cheating, every bit as much as making a false claim").

Allowing the Plan another bite at the apple would resurrect the very problem that Cloud was trying to rectify by bringing suit in the first place. *See Rossi*, 704 F.3d at 366 ("The Plan did not substantially comply with the 'full and fair review' requirement because it relied on an entirely different ground for denial on administrative appeal."); *Lafleur*, 563 F.3d at 155 ("These alternative reasons for denial may or may not be legitimate, but the fact remains that these were not the reasons for denial given at the administrative level.").

### E. The District Court Did Not Abuse Its Discretion by Allowing Limited Discovery.

The Plan makes a number of oblique allusions to the limited discovery allowed below. (Appellant's Br. at 4, 20, 33, 65). These stray references are

insufficient to preserve any issue for appeal. *See United States v. Stalnaker*, 571 F.3d 428, 439-40 (5th Cir. 2009) (concluding that the appellant "describe[d] a laundry list of grievances" but did "not cite the record or relevant law," thus waiving arguments due to "inadequate briefing").

The Plan is wise to avoid making this argument directly. After all, the Plan actively participated in discovery, including three depositions, multiple requests for written discovery, and production of thousands of pages of records. And at trial, *only the Plan* introduced live witness testimony.

Nor is the law on the Plan's side. The record in an ERISA case cannot be limited by a plan's say-so. Solely relying on plans to self-select what goes into an administrative record would conjure up images of foxes and henhouses.

Rather, there must be a "*meaningful* administrative record." *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 235 (4th Cir. 2008) (emphasis added). Since the plan administrator initially only has the "responsibility to compile a record that he is satisfied is sufficient for his decision," *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201 (5th Cir. 1997), later supplementation in court may be necessary. Thus, district courts have the authority to allow limited discovery. That decision is discretionary, and such a ruling "should be reversed only in an unusual and exceptional case." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 481 (5th Cir. 2018). That is especially true in this Circuit, whose

"administrative record law [is] more expansive than the rest of the circuits." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 516 n.9 (5th Cir. 2010).

In *Crosby*, for example, this Court vacated the district court's judgment and remanded for further discovery because "the court too narrowly defined the scope of discovery." 647 F.3d at 260. The opinion reiterated that "a court is afforded broad discretion when deciding discovery matters." *Id.* at 261. A plan participant "is not entitled to a second chance to produce evidence demonstrating that coverage should be afforded," but that does not "prohibit the admission of evidence to resolve other questions that may be raised in an ERISA action." *Id.* at 263. Thus, discovery can be appropriate to determine "the completeness of the administrative record," to determine whether the plan "complied with ERISA's procedural regulations," or to determine "the existence and extent of a conflict of interest" on the part of a plan administrator, by way of example. *Id.* The trust is placed in the district courts to "guard against abusive discovery." *Id.* at 264.

In fact, some of the claims Cloud brought were only subject to the looser discovery limits of Rule 26 of the Federal Rules of Civil Procedure anyway. *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 158, 264 (5th Cir. 2011) (limitations on discovery apply only to ERISA actions under 29 U.S.C. § 1132(a)(1)(B)). In any event, the control of discovery "is committed to the sound discretion of the trial court." *Manuel v. Turner Indus. Grp., L.L.C.*, 905 F.3d 859, 872 (5th Cir. 2018).

39

The Plan does not dispute any of this. Indeed, the Plan cites a recent Supreme Court decision in which the Court reiterated that discovery is allowed even in an action of limited review when there is "an incomplete administrative record." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2574 (2019).This Court has reached the same conclusion. *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992). In *Wildbur*, the Court explained that "some evidence other than that contained in the administrative record" may be relevant for judicial review. *Id.* For example, analyzing whether an administrator "has given a uniform construction to a plan may require a court to evaluate evidence of benefit determinations other than the one under scrutiny." *Id.* Further, "the factual background of the determination and any inferences of a lack of good faith" may "require the court to review evidence that was not presented to the administrator." *Id.* Thus, the Court specifically held that "a district court is not confined to the administrative record in determining whether, under our analytical framework, a plan administrator abused his discretion in making a benefit determination." *Id.* at 639. The Court also rejected the argument that reviewing such evidence "would undermine the utility and integrity of the administrative process." *Id.*

Here, the district court was mindful of the directive "to closely monitor discovery in ERISA cases" and therefore only allowed "limited supplementation" pursuant to "the narrow exceptions under which a district court can look beyond the

administrative record." ROA.11080.  For example, the district court accepted some evidence to understand medical terms and procedures at issue.  ROA.11080.  The court specifically noted that it was *not* considering such evidence "for the purpose of resolving disputed material facts or the merits of the claim itself."  ROA.11080.

Indeed, the vast majority of the evidence relied upon by the district court came from what the Plan labeled as the "X-FILE," which consisted of documents that only related to Cloud and his quest for benefits.  The Plan reviewed and explicitly stated that it did not object to the production of the "X-FILE."  ROA.10931-10936. Thus, reliance on such records could not constitute error.

## F.  The District Court Did Not Err in Entering Judgment in Favor of Cloud.

### 1.  *Cloud should have been reclassified under the Plan language.*

Contrary to the Plan's arguments, the record confirms that Cloud was eligible for reclassification.

First, the Plan is simply wrong when it asserts that Cloud "never claimed that he satisfied the 'changed circumstances' requirement for reclassification."  (*See* Appellant's Br. at 47).  That assertion is belied by Cloud's request for review— which expressly asserted that he met all requirements for the benefits he sought. ROA.14352-15354.

And of course, Cloud did present evidence of changed circumstances.  The record shows that he had "flipped the switch," ROA.16351, and that a psychologist

had determined that he exhibited all five symptoms of neurocognitive disorder, ROA.16415.   Cloud's request for reclassification identified new conditions, including affective disorder, that the Plan had not considered previously. ROA.15255, 15886.

Relatedly, the Plan argues that its current interpretation of "changed circumstances" should be given deference.  The phrase "changed circumstances" is not defined in the Plan.  ROA.11978.  All parties agree that a new concussion symptom can qualify as a changed circumstance.  ROA.15243, 15417.  Beyond that agreement, though, the definition is nebulous.  To ensure equal treatment, it is important that the same definition be used in all cases.  ROA.15591.  The Plan cites three cases that analyzed the Plan's interpretation of the term as requiring a change in the player's physical condition.  (Appellant's Br. at 50-51, 52 (describing the three cases as an "unbroken line of case law")).  However, the Plan never addresses the instances cited by the district court in which the Plan adopted a *different* definition. Further, the Plan overlooks the record evidence confirming that its interpretation has "evolved." ROA.656, 687, 15881.  Indeed, the testimony at trial was that there is no definition of "changed circumstances." ROA.13854.  A lack of uniform construction is the first factor in analyzing whether a plan's interpretation is legally sound. *See Wildbur*, 974 F.2d at 637-38.

Second, Cloud became totally and permanently disabled as a result of "cumulative mental disorders" that occurred "shortly after" injuries suffered through the 2005 NFL season. Again, under the Plan a condition is *conclusively* deemed to occur "shortly after" an injury if it arises within six months after the disability first arises, and can be deemed to occur "shortly after" if it arises within 12 months after the disability first arises. ROA.200, 11977. Cloud sustained a major concussion on October 31, 2004, and a physician specially trained in the effects of concussions stated that "significant physical and cognitive problems occurred immediately after this collision." ROA.14350. Cloud continued to take hits throughout the 2005 NFL season (concluding in January 2006), including a November 2005 concussion and multiple subconcussive blows. According to one Board member, Cloud was required to show he was totally and permanently disabled by "January 1 of 2007." ROA.15890. Cloud showed as much, and the district court agreed without challenge by the Plan.

The fact that the Social Security Administration awarded benefits based on a later onset date is irrelevant. As the district court noted, and the Plan did not challenge, the Social Security Administration determination date is not binding on the Plan or a court. ROA.12561. There was substantial evidence confirming that Cloud was totally and permanently disabled at the conclusion of the 2005 NFL season.

Third, even if the disability did not arise "shortly after" the conclusion of the 2005 NFL season, Section 5.3(a) of the Plan dispenses with this requirement upon the application of the "Special Rules" set forth in Section 5.4(b). ROA.14674. The requirements of Section 5.3(a) are "subject to" to the Special Rules. *See Cedyco Corp. v. Petroquest Energy, LLC*, 497 F.3d 485, 489 (5th Cir. 2007) (explaining that "'[s]ubject to' means likely to be conditioned, affected, or modified in some indicated way, and having a contingent relation to something and usually dependent on such relation for final form, validity or significance" (internal quotation and alteration omitted)); *see also Clean Air Council v. U.S. Steel Corp.,* 4 F.4th 204, 210-11 (3d Cir. 2021) (explaining that the phrase "'subject to' unambiguously means 'governed or affected by'"). Applying the plain meaning of the Plan's Special Rules, the district court correctly concluded that Cloud was not required to meet the "shortly after" language of Section 5.3(a) so long as he established a psychological/psychiatric disability caused by or relating "to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions)." ROA.14674. Cloud established and met the requirements of the Special Rules.

The Plan now argues that the "Special Rules" in Section 5.4(b) *also* include the "shortly after" requirement of Section 5.3. (Appellant's Br. at 56-57). Simply put, that is not what the Plan language says. So long as a player is totally and

44

permanently disabled and has a psychological/psychiatric disorder caused by head injuries, that player can obtain Active Football benefits.  ROA.201.  The evidence showed, and the district court concluded, that Cloud had established as much.

### 2.  Remand to the Plan Would Have Been Unnecessary and Futile.

"The only remaining question is of remedy."  *Hamsher v. N. Cypress Med. Ctr. Operating Co.*, 620 F. App'x 236, 240 (5th Cir. 2015) (per curiam).  Remand to the plan is "usually" the appropriate remedy, but the practice in this Circuit "is different where, as here, the administrator's denial is not supported by concrete evidence in the record."  *Id.* (internal quotation omitted).  In those instances, judgment for the plan participant is appropriate.  *Id.*  Here, as in *Hamsher*, the Plan had an opportunity to create a record that would support denial of benefits; "[i]t simply failed to do so."  *Id.* at 241; *see also Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288-89 (10th Cir. 2002) (explaining that remand is appropriate when a plan administrator "fails to make adequate findings or to explain adequately the grounds of her decision," but remand is *not* necessary when "the evidence clearly shows that the administrator's actions were arbitrary and capricious").

In other words, although remand is appropriate in some cases, it is not necessary.  In *Robinson*, for example, this Court instructed that judgment should be entered in favor of the participant.  443 F.3d at 397.  Although the plan argued that remand was required, this Court "declined a remand to allow the administrator

another opportunity to make a record." *Id.* at 397 n.5 (internal quotation omitted). Similarly, in *George*, this Court rendered judgment for the plan participant when the plan abused its discretion in determining that the participant was not totally disabled. 776 F.3d at 356.

That same rule applies to the Plan. *See Ashmore v. NFL Player Disability & Neurocognitive Benefits Plan*, No. 16-81710-CIV-MARRA, 2018 WL 3424453, at *9 (S.D. Fla. June 15, 2018) (concluding there was "no reasonable basis" to deny benefits when the "denial of benefits to Plaintiff was arbitrary and capricious"); *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,* No. WDQ-09-2612, 2012 WL 2374661, at *15 (D. Md. June 19, 2012) (concluding there was "adequate evidence" in the record to render a decision in favor of the disabled former NFL player). In previous cases, the Plan has made remand to the Board a frustrating endeavor, including leaving former players and their counsel "in the dark during the entirety of the remand process." *Dimry*, 855 F. App'x at 334.

Further, remand is unnecessary when a plan makes "both an eligibility and merits determination . . . to which it remains committed." *Newsom*, 26 F.4th at 337-38. Here, the Board is committed to denying benefits to Cloud no matter what. *See, e.g.*, ROA.13815-13816, 13980. Remanding to the Board for additional review would be nothing more than an exercise in futility. *See Lafleur*, 563 F.3d at 157-58.

### G. The District Court Did Not Abuse Its Discretion in Awarding Attorney Fees.

The Plan makes no real challenge to the district court's award of attorney fees and costs and, thus, has waived any such argument.  (*See* Appellant's Br. at 69). That strategic decision is not surprising, since fee awards are only reviewed for an abuse of discretion.  *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 846 (5th Cir. 2013); *see also Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254 (2010) ("Statutes vesting judges with such broad discretion are well known in the law, particularly in the attorney's fees context.").  The Plan has certainly not shown an abuse of discretion here.

### <u>CONCLUSION</u>

For the foregoing reasons, the decision of the district court should be affirmed.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

/s/Christian S. Dennie
Christian S. Dennie
Texas Bar No. 24045775
cdennie@foxrothschild.com
2501 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone:  (972) 991-0889
Facsimile:  (972) 404-0516

Matthew Nis Leerberg
N.C. State Bar No. 35406
mleerberg@foxrothschild.com
434 Fayetteville Street, Suite 2800

Raleigh, North Carolina 27601
Telephone:  (919) 755-8700
Facsimile:  (919) 755-8800

Kip D. Nelson
N.C. State Bar No. 43848
knelson@foxrothschild.com
230 N. Elm Street, Suite 1200
Greensboro, North Carolina 27401
Telephone:  (336) 378-5200
Facsimile:  (336) 378-5400

***Attorneys for Plaintiff-Appellee***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2023, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/Christian S. Dennie
Christian S. Dennie

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 10,795 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

/s/Christian S. Dennie_____
Christian S. Dennie

50